Terry L. SHELTON *v*. James T. SHELTON

88-14                                                                 752 S.W.2d 758

Supreme Court of Arkansas
Opinion delivered July 11, 1988

*Brazil, Clawson & Adlong*, by: *Matthew W. Adlong*, for appellant.

*Hoofman & Bingham, P.A.*, by: *John Biscoe Bingham*, for appellee.

DAVID NEWBERN, Justice. Terry L. Shelton, the appellee, sued his father, James T. Shelton, the appellant, for intentionally interfering with Terry's contract right to employment by C & F Coffee Company, a corporation of which each of them owned fifty per cent. The jury returned a verdict in Terry's favor for $23,000 for lost wages, $60,000 for wages to be lost in the future, and $17,000 punitive damages. The trial court gave Terry Shelton the option of a remittitur of $75,000, thus reducing the damages to $25,000, or the granting of a new trial. We hold the court abused its discretion in holding that the damages were excessive, and thus the order conditionally granting a new trial is reversed.

C & F Coffee Company sells supplies to restaurants and snack bars. James Shelton has worked for the company since 1954. Terry testified he went to work for the company in 1975, at age 17, when James had a heart attack, and someone was needed to operate James's route. James Shelton purchased an interest in the company in 1978. Terry purchased an interest in 1981, and the two became sole owners in 1983.

James and Terry each operated truck routes, and each was paid one-half the profits from his route sales, receiving no other income from the corporation. In 1981, Terry was injured in a wreck while driving his route. He testified he suffered some soreness and stiffness after the wreck for which he sought chiropractic treatment, but he continued to work some four years before he had surgery, in May, 1985, on his neck. Two disks were removed in that operation, and in August, 1985, he had further surgery to relieve pain from muscle spasms in his neck. Terry and his former wife testified about the pain and suffering caused by the injury to Terry's neck and how he was progressively affected by continuing to work his truck route prior to the surgery.

After the surgery, Terry continued to work, but did not drive the truck route. He testified he did odds and ends at the company building. He and James had discussed his taking over the bookkeeping job from his mother. He had been told, presumably by his doctor, not to try the truck route until January, 1986. He then tried the truck route again for a four to six week period to

replace an employee who had been fired. He found that he could not do the work without aggravating his condition.

James Shelton apparently became angry because Terry would not continue to drive the truck route. There was a confrontation each time Terry would attempt to come to the business. Terry tried again to drive for two weeks in July, 1986. The relationship continued to deteriorate, and in October, 1986, when Terry again ran his route for a short time, James told Terry not to take anything from the business. James would order Terry off the company premises when he attempted to come to work. James admitted he and Terry both used profanity in these encounters and that he thought of harming Terry. He admitted threatening Terry and that he might have said he would break Terry's neck again, but he denied having threatened to burn Terry's house. Terry then began avoiding James by coming in after hours to load his truck. James had the locks and the burglar alarm changed so that Terry could not enter the building.

James Shelton refused to sign Terry's paycheck in July, 1986. Terry continued to come to work until November of that year without being paid. He ran his route again October 8 to November 3, 1986, replacing an employee who had been fired, and, instead of turning over the receipts to James, he deposited them in a separate company bank account he had opened. On November 3, 1986, Terry wrote a letter to James stating that he could no longer service his accounts without access to the building. He enclosed records pertaining to his accounts. This action was filed in December, 1986.

Terry testified from a C & F Coffee Company payroll sheet, which was introduced as an exhibit, that during the period January to July, 1986, when he ceased to be paid for his work, he earned $11,494. Based on that figure, he testified he was making $22,988 annually. He testified he had sought employment unsuccessfully and had concluded that when he did find work he would be "starting all over" with a job paying $4.50 or $5.00 per hour. He said at that rate he would earn $10,000 or $10,500 a year which would be $11,000 or $12,000 less than he had been earning at C & F Coffee Company, and that it would take him six to ten years to increase his salary to that which he had earned with the company.

After the jury returned its verdict in favor of Terry Shelton, James Shelton moved for judgment notwithstanding the verdict on the ground that there was no substantial evidence to support the damages awarded. Alternatively, he moved for a new trial on the ground that the damages were clearly excessive and the verdict was contrary to the preponderance of the evidence. In response, the court granted the motion for new trial conditioned upon the remittitur described above. The court's order recited, in part:

1. The verdict of the jury was so clearly and palpably contrary to the preponderance of the evidence that at first blush it shocked the Court's sense of justice.

2. The excessiveness of the verdict was fueled by the passions and prejudice of the jury due to the unbridled emotions manifested at the trial, which infiltrated the minds of the jurors, denying them the capacity to deal justly with the evidence.

## 1. Clear preponderance of the evidence

Arkansas R. Civ. P. 59(a)(6) permits the court to grant a new trial when "the verdict or decision is clearly contrary to the preponderance of the evidence or is contrary to the law." We agree with Terry Shelton's contention that while the trial court has some discretion in granting a new trial on this basis, it may not substitute its view of the evidence for that of the jury. *Brant* v. *Sorrells*, 293 Ark. 276, 737 S.W.2d 450 (1987); *People's Bank and Trust Co.* v. *Wallace*, 290 Ark. 589, 721 S.W.2d 659 (1986).

The award of $23,000 for the loss of a year's wages was clearly supported by Terry's testimony and the company record showing he would have earned that much, based on projection of his last six months earnings, in the year since he was last paid. While the $60,000 awarded for loss of future earnings is some-what more speculative, it can hardly be said to be out of line with the evidence. If Terry earns, for example, $11,500 in the first of the ten years he predicted it could take him to reach his old earning figure of $23,000, he would lose $11,500 that year. Decreasing that loss by ten per cent in each of the following nine years his total loss would be $63,250. If he were to earn only $10,500 in his first year, his ten year loss, figured the same as

above, would come to $68,750. Terry's testimony was that he thought he could be earning $23,000 annually in six to ten years. If he achieves it in less than ten years, of course his loss will be less. The point is that there was testimony on which the jury could have based its $60,000 award. James Shelton presented no evidence to contradict Terry's testimony.

██ In *Cates* v. *Brown*, 278 Ark. 242, 645 S.W.2d 658 (1983), we held that the evidence necessary to show loss of future earnings with reasonable certainty must consist of (1) the amount of wages lost for some determinable period, and (2) the period during which future wages will be lost. Both of those requirements are addressed in Terry Shelton's testimony. By entering the new trial order conditioned on remittitur, the trial court indicated the only problem was the amount of damages rather than the existence of damages in some amount. The question of whether any damages were warranted is not before us. In *Wasp Oil, Inc.* v. *Arkansas Oil & Gas, Inc.*, 280 Ark. 420, 658 S.W.2d 397 (1983), we noted that in some instances damages cannot be proved with exactness, and in those cases we do not reverse if the cause and existence of damages have been shown despite the inability to prove precisely what the plaintiff has lost.

██ Nor was the award of $17,000 punitive damages clearly against the preponderance of the evidence. James Shelton did not contend his actions were anything but intentional. The malice with which he acted toward Terry was apparent from his testimony as well as from the testimony of Terry and other witnesses. Punitive damages may be awarded when the evidence indicates the defendant acted wantonly or with such indifference to the consequences of his act that malice can be inferred. *National By-Products, Inc.* v. *Searcy House Moving Co. Inc.*, 292 Ark. 491, 731 S.W.2d 194 (1987).

### 2. Passion and prejudice

Having found factual support for each element of the jury's award, it becomes difficult for us to find support for the trial court's conclusion that the jury was motivated by passion and prejudice. The trial court saw the witnesses and must know far more than we could know about the feelings they displayed at the trial. We are thus reluctant to say that the court abused its discretion in granting a new trial in this instance. However, it is

clear that we have a responsibility to review the trial court's decision on appeal. Unless there is support which can be found in the record for the trial court's decision to set aside the jury's verdict conditionally, we must reverse.

While we find no cases in which we have reversed a trial court's determination that a new trial should be granted on the ground of excessiveness of damages, cases in which we have affirmed such decisions are instructive on the standard we apply. In *Newberry* v. *Johnson*, 294 Ark. 455, 743 S.W.2d 811 (1988), we affirmed a trial court's new trial order on the ground that the amount of damages awarded was "totally unsupported and far exceed[ed] the evidence presented by the appellant" and "we [could] find nothing in the record that even comes close to establishing her damages at the excessive amount the jury awarded her." 294 Ark. at 460. Another case in which we affirmed a new trial order based on excessiveness of damages is *Freeman* v. *The Morrilton Water Co.*, 274 Ark. 419, 625 S.W.2d 492 (1981), where we found the jury award to have been totally out of proportion to the proof. None of those circumstances exist here.

Reversed and remanded.

HICKMAN and PURTLE, JJ., dissent.

DARRELL HICKMAN, Justice, dissenting. The majority thinks the judge was wrong and substituted his judgment for that of the jury. I think the majority is confusing its role with that of the trial judge. We have consistently upheld the trial judge's power to examine a verdict, weigh the evidence and finally decide, as a check against passion and prejudice, whether a verdict stands or not. *Brant* v. *Sorrells*, 293 Ark. 726, 737 S.W.2d 450 (1987); *Saber Mfg. Co.* v. *Thompson*, 286 Ark. 150, 689 S.W.2d 567 (1985); *Clayton* v. *Wagnon*, 276 Ark. 124, 633 S.W.2d 19 (1982).

We did not hear the testimony and cannot determine the credibility of the witnesses; yet the majority takes at face value the testimony of the parties and decides who is telling the truth. The jury initially has that power, and the trial judge has it on a motion for a new trial. We never have that power.

I would affirm the trial court's judgment.

PURTLE, J., joins the dissent.